UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Keith Kreszowski,                                    Case No. 3:19-cv-2989

        Plaintiff,

v.                                                   MEMORANDUM OPINION
                                                     AND ORDER

FCA US LLC,

        Defendant.

## I. INTRODUCTION

Defendant FCA US LLC seeks summary judgment on all claims asserted by Plaintiff Keith Kreszowski. (Doc. No. 16). Kreszowski opposes FCA's motion, (Doc. No. 25), and FCA filed a brief in reply. (Doc. No. 26). After obtaining leave, Kreszowski filed a sur-reply brief. (Doc. No. 29). FCA moves to strike Kreszowski's sur-reply or, in the alternative, to file a response to the sur-reply. (Doc. No. 31). Kreszowski opposes the motion to strike. (Doc. No. 32). For the reasons stated below, I deny FCA's motion to strike and grant its motions for leave to file a response and for summary judgment.

## II. BACKGROUND

This case follows an earlier case Kreszowski filed against FCA and his union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 12. *See* Case No. 3:17-cv-2371. Kreszowski asserts claims for disability discrimination and retaliation allegedly arising from factual circumstances which occurred after the events at issue in the 2017 case. (Doc. No. 1).

The parties' arguments in this case depend upon the facts developed in the 2017 case. (Doc. No. 16-1 at 6; Doc. No. 25 at 9). Therefore, I incorporate relevant portions of the factual background from the 2017 case below. The documents cited in this recitation refer to documents filed in the 2017 case.

> Kreszowski began working on FCA's production line in July 2013. . . . One of Kreszowski's coworkers on the afternoon shift was Ken Sukalo. In late September 2016, Kreszowski submitted a safety complaint against Sukalo, asserting Sukalo had committed a safety violation by manually disabling a stop pole on the assembly line. (Doc. No. 49 at 11-12). According to Kreszowski, Sukalo's action came without warning and created a risk that Kreszowski could have been hit by a vehicle moving down the assembly line. (*Id.*).
>
> A few days later, on September 30, 2016, Kreszowski shut down production on the line after witnessing Sukalo walk away from his workstation. (*Id.* at 13). The line was down for approximately 10-15 minutes, until workers in the skilled trades department were able to come to that portion of the plant and restart the line. (*Id.*). Kreszowski submitted another safety complaint to Dianna Kurth, the team leader in his part of the assembly line . . . . (*Id.*).
>
> On October 6, Kreszowski received a verbal warning from his supervisor, Nichole Banks, for failing to follow safety procedures when he shut down the line. Kreszowski was upset Banks disciplined him based upon what Kurth and Sukalo had told her, and without talking to him first. (*Id.* at 14-15). Kreszowski acknowledged raising his voice, speaking quickly, and using hand gestures, but denied yelling or screaming while talking to Banks. (*Id.* at 15). Kreszowski asserted he commonly speaks quickly and uses hand gestures during conversation. (*Id.*). He stated he was "being firm" in order to communicate his disagreement with Banks disciplining him without first getting his side of the story. (*Id.*).
>
> Kreszowski left the meeting with Banks and went to talk to Rex Maze, the UAW Safety Coordinator. About 10 or 15 minutes later, Kurth came to Maze's office to talk to Kreszowski. After Kurth denied telling Banks anything about the September 30 incident, Kreszowski said he was thinking about calling the Occupational Safety and Health Administration ("OSHA") and stated that, if OSHA came to the plant, "with all the safety issues and hazards they got, they'd shut down the plant in reference to safety." (Doc. No. 49 at 17). Kreszowski repeated the same statement to Brian Sims, a UAW representative. (*Id.*).
>
> While he was in Maze's office, Kreszowski requested and received permission to take the next day off of work, with the intention of going to the OSHA office to file a complaint. (*Id.* at 18). After some further discussions with Maze, Sims, and others, Kreszowski left the plant and went home. After he left, he sent a text message to Kurth asking for Banks' last name, so he could include it in his whistle blower complaint. (*Id.* at 17). At some point during their conversations on the night of

2

October 6-7, Kreszowski said something that Kurth interpreted as a threat. (*Id.* at 18-19). Kurth reported this development to Banks. (*Id.*).

Kreszowski took October 7 off, as scheduled, and filed a complaint with OSHA. (*Id.* at 20). He also sent a text message to Larry Maurer, the plant Operations Manager, indicating he thought his health and safety were being compromised at FCA, and that Sukalo was dangerous. (*Id.*).

On October 10, Kreszowski met with a joint FCA-Union group known as a Local Response Team ("LRT"). The LRT is a collectively-bargained committee made up of designated individuals from both entities, including FCA management and members of the Union leadership, security and medical officers, and a representative from the Union's Employee Assistance Program. The LRT is intended to prevent "troubling situations from worsening." (Doc. No. 50-12 at 2).

During the October 10 meeting, Kreszowski provided a two-page summary of the October 6 incident and his specific concerns about Sukalo's actions. (Doc. No. 49 at 21; Doc. No. 49-2 at 1-2). Kreszowski also indicated he was concerned about whether he would be safe working under Banks' supervision in the future, because she had disciplined him and not Sukalo. (Doc. No. 49 at 21).

The parties disagree about Kreszowski's conduct during the meeting. Mark Epley, a Union representative and a participant in the October 10 meeting, states "Kreszowski was very agitated during this meeting and was slamming his fist on the table. He seemed almost out of control." (Doc. No. 50-12 at 3). Connie Rubin, a human resources department employee and participant in the October 10 meeting, later reported that, when she reached out her hand to touch Kreszowski's arm, he "glared at her and said, 'You don't want to do that.'" (Doc. No. 54-3 at 9). Kreszowski denied pounding his fists or hands on the table or being out of control. (Doc. No. 49 at 22). He described himself during the meeting as "[p]robably excited . . . [and a] little nervous." (*Id.*).

During the meeting, Epley requested that Kreszowski's October 6 disciplinary notice be removed from his record. (Doc. No. 50-12 at 3). FCA agreed to the request and the discipline was voided. (*Id.*; Doc. No. 49-6). At the conclusion of the meeting, the LRT told Kreszowski he could return to his workstation. (Doc. No. 49 at 24). Kreszowski, feeling "a little threatened" by what he viewed as "hostile and retaliatory circumstances," asked for the rest of the day off. (*Id.* at 23-24). After leaving work, Kreszowski still had reservations about returning to work. He then received permission to take the next two days – October 11 and 12 – off as well. (*Id.* at 24-25).

Kreszowski returned to FCA on October 13 for another meeting with the LRT. Kreszowski presented some additional written concerns during that meeting. (Doc. No. 49-3). He expressed concern for his safety and welfare, as well as concern that Banks and Sukalo would retaliate against him. (*Id.* at 1). He requested a transfer to another job assignment, stating "[t]he frustrations and repetitive actions that have occurred within the group has put myself in a[n] emotional state that is detrimental,

3

and I am attempting to eliminate[] that state of mind due to the environmental conditions that exist." (*Id.*). He asserted the Union and FCA had failed to assist him with the safety concerns he previously had raised about his work environment and concluded by saying he would "continue to sort matters of concern[] and any repercussions that may occur in the future to the best of my ability and determine what resources are available to assist me with the unforeseen circumstances." (*Id.* at 2). Kreszowski believed Sukalo, Kurth, and Banks coordinated to discipline him for the September 30 incident and that there was a "strong likelihood" they would engage in similar behavior in the future. (Doc. No. 49 at 26).

During the meeting, one of the LRT members, Charlene Hutchinson, asked Kreszowski if he could guarantee he wouldn't harm someone when he returned to work. (*Id.* at 28). Kreszowski denied he would harm anyone, but stated he may not take otherwise-appropriate actions (like shutting down the line again) because he was afraid of being disciplined again and that such a situation might result in harm to himself or a coworker. (*Id.*). Epley, concerned Kreszowski was implying "he did not know if he would be safe and cause no harm if he returned to work," interrupted Kreszowski and told him to choose his words carefully. (Doc. No. 50-12 at 3). Kreszowski thought this was a misinterpretation of what he was saying, though he admits he was under a fair amount of stress during the October 13 meeting due to his worries about his work environment. (Doc. No. 49 at 28). Epley recalled that Kreszowski "became very upset . . . [and] kept talking about feeling unsafe and unsure." (Doc. No. 50-12 at 3).

At the end of the meeting, Kreszowski requested additional time off work, with a return to work date of October 24, 2016. (Doc. No. 49 at 28). FCA approved his request as a personal leave of absence. (*Id.*). After the meeting, Epley called Kreszowski to tell him FCA had "a little bit of concern" about the way he answered Hutchinson's question. (*Id.* at 29). The next day, Tonya Tooson, an FCA human resources employee and an LRT member, called Kreszowski to tell him FCA was requiring him to undergo a fitness-for-duty exam before he could return to work due to the way he responded to Hutchinson's question. (*Id.*).

While Kreszowski disagreed with FCA's decision to continue his time off work as a personal leave of absence because his time off work was not voluntary, (*id.*), both Tooson and Epley described this characterization as the standard practice. (*Id.*; Doc. No. 50-12 at 4). Epley told Kreszowski he could go on medical leave if he saw the plant doctor and that a personal leave of absence was "actually more beneficial" because he received full pay rather than a reduced pay rate under the Sickness and Accident policy. (*Id.*). . . .

On October 19, Kreszowski attended a psychological appointment Tooson scheduled with Dr. James Knowles, a Licensed Clinical Psychologist. Kreszowski described this meeting as short and indicated he did not learn until after the appointment that he could not return to work unless Dr. Knowles cleared him. (*Id.* at 29-30). Dr. Knowles did not clear Kreszowski after the initial appointment because he wanted to perform a more comprehensive evaluation, including administering the Minnesota Multiphasic Personality Inventory-2. (Doc. No. 53-3 at

4

1).  FCA extended Kreszowski's leave of absence beyond October 24, which led Kreszowski to file a charge of discrimination against FCA on October 25, 2016. (Doc. No. 49-4).  Kreszowski alleged FCA discriminated against him based upon a perceived disability by requiring him to complete the fitness-for-duty exam before returning to work.  (*Id.* at 1).  In February 2017, Kreszowski also filed a charge of discrimination against the UAW, alleging the Union had failed to advocate on his behalf because of a perceived disability.  (Doc. No. 51-4).

Kreszowski ultimately had a total of four sessions with Dr. Knowles.  On November 28, 2016, after the fourth session, Dr. Knowles approved Kreszowski to return to work but recommended he attend anger management classes and substance abuse counseling; and that he participate in cognitive-behavioral therapy to assist with stress management and anxiety reduction and support.  (Doc. No. 53-3 at 1-3).

Jo'Lena Brown, an FCA labor relations specialist, approved Kreszowski's request to return to work on November 30, 2016, and informed him he would be made "whole for all lost time from October 10th to date."  (Doc. No. 53-2 at 1).  Further, Brown reiterated that Kreszowski was required to attend anger management classes after coordinating with a Union EAP representative.  (*Id.*).  Kreszowski contends he was not made whole, because he "did not receive time and a half he should have received, nor did he receive compensation towards his 401(k) for approximately a seven week period of time."  (Doc. No. 58 at 10); (*see also* Doc. No. 49 at 36).

Kreszowski had another meeting with the LRT upon his return to work.  He again expressed concerns that Sukalo and Banks would create a hostile environment for him because FCA and the Union did not investigate the incident leading Banks to issue Kreszowski a verbal disciplinary warning on October 6.  (Doc. No. 49 at 36-37).  Kreszowski returned to his previous work assignment where, he asserts, he was subjected to a hostile environment by Sukalo and others.  (*Id.* at 37).  During his shift, Kreszowski had another employee call the skilled trades department to come down and fix a piece of equipment.  (*Id.*)  The skilled trades employee came down, along with Banks and several people from FCA management and the Union.  (*Id.* at 38).  Kreszowski contends Sukalo told people that Kreszowski had intentionally sabotaged the equipment and sought to harass him by making the incident into a larger situation.  (*Id.* at 39-40).  He also contends Sukalo and another employer, Cheri Hauser, were working together to intimidate and harass him for complaining to the HR department about the actions and conduct of some of his coworkers.  (*Id.* at 40-41).

In the ensuing months, Kreszowski raised complaints regarding a variety of workplace incidents and interactions.  (*Id.* at 42-47).  Frustrated with what he viewed as lack of concern for these incidents, Kreszowski began contacting individuals in higher level management positions in FCA and the Union, including the then-CEO of FCA Group (Sergio Marchionne) and the Chief Human Resources Officer for FCA North America (Linda Knoll).  On February 8, 2017, Kreszowski emailed Knoll, Brown, Epley, and another FCA employee named Christopher Capoldo to raise concerns that Banks was harassing him and retaliating against him because she "always questions" whether repairs or service Kreszowski requested were

5

"necessary." (Doc. No. 49-8 at 4). Kreszowski believed this was a continuation of the issues about which he had raised complaints in the fall of 2016. (*Id.*).

In response, Vicki Patterson, an attorney and investigator in FCA's corporate office of Equal Employment Opportunity Compliance and Governance, initiated an investigation and contacted Kreszowski to discuss his concerns. (Doc. No. 54-3). While Kreszowski initially expressed interest in talking with Patterson, (Doc. No. 49-8 at 3-4), he subsequently told Patterson he felt she would "not respond in a balanced non biased manner," even if she concluded Banks, Sukalo, and the LRT members had acted hostilely toward him. (*Id.* at 1-2).

Kreszowski also took issue with the scope of Patterson's investigation. Patterson told Kreszowski she would investigate whether Bank had harassed, discriminated against him, or retaliated against him in violation of FCA's policies. (*Id.* at 11). She indicated, however, it was not her role to consider his OCRC charge, Brown's response to Kreszowski's claims he was owed money from his leave of absence, or whether the Union fairly represented him. (*Id.*). Kreszowski believed all of the incidents and occurrences about which he had complained were connected and related to the LRT's decision to require him to undergo a fitness-for-duty exam, and if Patterson was not willing to "revisit those issues and others[,] then certainly you, your office, and FCA [have] no concern or focus on eliminating corporate cultures and attitudes that foster and condone discrimination, intolerance, harassment, and the barrier that prevent equal opportunities." (*Id.* at 10-11).

While continuing to correspond with Kreszowski by email, Patterson also arranged for interviews with Kreszowski and others. In late March and early April 2017, Patterson interviewed Kreszowski, Sukalo, Tooson, Rubin, and Epley, among others. (Doc. No. 54-3 at 2-3, 5-12). Kreszowski continued to email Patterson with details of the alleged discrimination and harassment, and to take issue with the limited scope of her investigation. (Doc. No. 49-8 at 39-45). In particular, Kreszowski continued to accuse Patterson of having predetermined the outcome of her investigation in order to protect management officials at FCA and the Union. (*See, e.g., id.* at 39).

At some time in April 2017, Kreszowski and other employees were laid off as part of a shutdown for a plant-wide retooling. (Doc. No. 49 at 49-50). During the lay-off, Kreszowski learned that in October 2016, Keith Carr, a human resources representative, had filled out and signed a leave of absence form on Kreszowski's behalf. (Doc. No. 49-9). Kreszowski considered the document to be fraudulently submitted, because he did not know about it or authorize it before it was submitted. (Doc. No. 49 at 51). Roy Richie, FCA's Director of Labor Relations, indicated it is "not uncommon for an HR person to . . . fill out the form and subsequently approve it." (Doc. No. 52 at 4).

Over the next few months, the investigations into Kreszowski's allegations came to a close. On June 29, 2017, the OCRC issued a no-probable-cause decision with regard to Kreszowski's charge against FCA. The OCRC concluded there was no credible evidence to support Kreszowski's claim that he had been unlawfully discriminated against because FCA had "reason to believe [Kreszowski] needed to be placed on

6

leave for safety reasons," he received paid time off, and his discipline was voided. (Doc. No. 49-5 at 1). Then, by a letter dated August 14, 2017, Patterson notified Kreszowski she had completed her investigation and determined there had not been a violation of FCA's discrimination and harassment prevention policy. (Doc. No. 49-10). . . .

Kreszowski continued to raise his concerns about how he had been treated by sending emails to a variety of FCA and Union officials. By Kreszowski's estimate, he sent "a couple dozen" emails to Marchionne and Knoll alone. (Doc. No. 49 at 52-53). At one point, Brown requested that Kreszowski stop sending emails to Knoll, though Kreszowski continued to do so.[1] (*Id.* at 53).

The lay-off was scheduled to end in October 2017. Prior to the end of the lay-off, Richie met with Kreszowski, Bruce Baumhower, (the UAW Local 12 President), and Harvey Hawkins (a UAW International representative) to discuss Kreszowski's concerns, as well as some concerns plant personnel had raised regarding Kreszowski. (Doc. No. 52 at 5). Though Richie was concerned by some of Kreszowski's "references to some of the folks at the plant," he assured Kreszowski that he would look into the leave-pay issue from October 2016, as well as Kreszowski's safety concerns. (*Id.*). Kreszowski, however, sought more drastic assurances, indicating to Richie that he could not come back to work and be productive unless Richie terminated "a number of HR professional and unions reps in the plant." (*Id.*). Kreszowski believed Rubin, Tooson, and Epley had engaged in deceptive actions with "evil intentions" and should be terminated because of that and in connection with the leave of absence form Carr signed and approved. (Doc. No. 49 at 55).

Following the meeting, Richie told Kreszowski he would need to complete another fitness-for-duty exam before returning to work. Richie states he expressed to Kreszowski that

> based upon the meeting that we had with Mr. Hawkins and Mr. Baumhower present, references that he made to professionals in the plant, union reps being evil and having evil intentions along with the fact when I asked Mr. Kreszowski what would it take for him to return to work and be a productive member of the plant, his response was that certain individuals in the HR department and the UAW would have to be terminated in order for that to happen. (Doc. No. 52 at 7).

Richie then placed Kreszowski on a company-paid leave for a few weeks before he transitioned to a medical leave. (*Id.* at 8-9). According to Richie, Kreszowski "did not receive that information well." (*Id.* at 7). Kreszowski again raised concerns about how he would be paid. He argued he should receive overtime pay for the days

---

[1] By November 2017, FCA had taken action to intercept Kreszowski's emails. Any email Kreszowski sent to an FCA email address was rerouted to Rubin. (Doc. No. 49 at 60). Kreszowski began changing his email address in order "to get around everything going to Connie Rubin." (*Id.* at 60-61).

7

when his group worked more than 8 hours. (Doc. No. 49 at 55). Richie rejected this position because the Collective Bargaining Agreement entitled hourly employees to 40 hours per week, with any overtime hours being "at the discretion of management." (Doc. No. 52 at 7).

On October 30, 2017, Kreszowski met with Dr. Craig Lemmen, a psychiatrist, for an interview for his second fitness-for-duty exam. Dr. Lemmen concluded that, while Kreszowski was not at an increased risk of causing significant harm to himself or others and could adequately perform specific job tasks, he did have "a psychiatric problem which interferes with his ability to positively interact with co-workers and supervisors." (Doc. No. 54-2 at 3-4). Dr. Lemmen recommended FCA provide Kreszowski with time off from work so that he could participate in psychotherapy to assist him in reducing problematic interactions with his co-workers and supervisors. (*Id.* at 4-5).

Pursuant to Dr. Lemmen's recommendations, FCA instructed Kreszowski to schedule an appointment with a psychiatrist, and to see a psychologist while waiting for his psychiatry appointment. (Doc. No. 49-15). The record is unclear as to whether Kreszowski saw a psychologist before he subsequently began seeing a psychiatrist, Dr. Kettlie Daniels, in January 2018. According to Kreszowski, his relationship with Dr. Daniels got off to a rocky start. He believed he was required by FCA to see Dr. Daniels for a treatment plan provided by Dr. Lemmen, while Dr. Daniels thought she was supposed to perform an evaluation and assessment. (Doc. No. 49 at 58). Kreszowski eventually signed a consent form allowing Dr. Daniels to talk with Richie to get additional information, but then came to believe that Dr. Daniels would not be able to implement a useful treatment plan because she "accepted Roy Richie's version of events as the facts" and based his treatment plan on "falsehoods that [were] injected into the circumstances." (*Id.* at 59).

Dr. Daniels diagnosed Kreszowski with an adjustment disorder, indicated he was not cleared to return to work, and provided a certification for his medical leave. (*Id.*). She also proposed a treatment plan and recommended Kreszowski take certain medications as part of his treatment. (*Id.*). Kreszowski ultimately refused to take the medications or to participate in Dr. Daniels' recommended treatment plan, believing she was not objective and tended to believe FCA's explanations over his own. (*Id.* at 59-60). Dr. Daniels eventually terminated the doctor/patient relationship in April 2018. (*Id.*; Doc. No. 49-16 at 25).

Kreszowski filed a second charge against FCA with the OCRC in November 2017, alleging FCA was retaliating against him for filing his previous OCRC charge by prohibiting him from returning to work following the lay-off, requiring him to undergo a second fitness-for-duty exam, and placing him on paid leave. (Doc. No. 49-13).

(Case No. 3:17-cv-2371, Doc. No. 65 at 1-12)

8

In July 2018, FCA contacted Kreszowski to notify him that his certification for his medical leave had expired and instructed him to submit an updated certification to its third-party administrator, Sedgwick, by the end of that month. (Case No. 3:17-cv-2371, Doc. No. 49 at 61-62). Kreszowski did so. Sedgwick then instructed him to provide a certification from a licensed psychiatrist. (Case No. 3:17-cv-2371, Doc. No. 49-19). Kreszowski subsequently attended an appointment with a psychiatrist at Harbor Behavioral Health. (Case No. 3:17-cv-2371, Doc. No. 49 at 63). He admits he did not provide the requested documentation at that time. (*Id.*).

On October 22, 2018, Kreszowski filed a third charge of discrimination against FCA, asserting FCA "would not accept" the assessment he obtained from Harbor. (Doc. No. 1-1).

On March 18, 2019, FCA sent Kreszowski a "five-day letter," which indicated his absence from work was not currently justified and directed him to report to work on or before March 25, 2019, or have his seniority terminated pursuant to the Collective Bargaining Agreement. The parties disagree about what happened next. FCA contends Kreszowski did not appear as directed or contact the plant and that, therefore, FCA terminated his seniority. (Doc. No. 16-1 at 5). Kreszowski contends he appeared at the plant on March 22, 2019, and he attempted to provide a copy of his evaluation from the Harbor psychiatrist. (Doc. No. 25-1 at 1). He asserts FCA refused to accept his documents or allow him to enter the plant. (*Id.* at 1-2).

### III.   STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. ANALYSIS

Kreszowski contends FCA discriminated against him based upon a perceived disability when it refused to allow him to return to work and retaliated against him for filing charges of discrimination with the Ohio Civil Rights Commission in October 2016 and November 2017. (Doc. No. 1 at 5-11). He asserts claims under the Americans with Disabilities Act and Ohio Revised Code § 4112.02. Federal caselaw interpreting federal employment discrimination statutes applies to employment discrimination claims under Ohio law. *See, e.g., Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Muir v. Chrysler LLC*, 563 F. Supp. 2d 783, 788 (N.D. Ohio 2008) (citing *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204 (Ohio 1998)).

### A. DISABILITY DISCRIMINATION

As I noted in my Memorandum Opinion and Order in the 2017 case, an employee may be "regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

FCA is entitled to summary judgment on Kreszowski's discrimination claims because Kreszowski fails to show FCA regarded him as disabled. Kreszowski does not identify any new evidence to support this required showing but relies solely on "the evidence and arguments set forth in his opposition to Defendant's Motion for Summary Judgment" in the 2017 case. (Doc. No. 25 at 9). I already have rejected his arguments in the 2017 case. (Case No. 3:17-cv-2371, Doc. No. 65 at 13-17). Therefore, Kreszowski has not carried his burden of establishing a prima facie case of

disability discrimination. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). There is "no need to address the question of pretext" where the plaintiff has not established a prima facie case. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998).

### B. RETALIATION

In order to prove FCA retaliated against him for filing Charges of Discrimination with the OCRC, Kreszowski "must show: '(1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action.'" *Sullivan*, 197 F.3d at 814 (quoting *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)).

Kreszowski's claim falls short because he has not established a causal connection between any of his OCRC charges and FCA's decision to terminate his seniority. As I stated in the 2017 case, courts "have rarely found a retaliatory motive based only on temporal proximity." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (noting the consistent requirement that plaintiff offer additional evidence).

As Kreszowski concedes, five months passed between his October 2018 charge and the March 2019 termination of his seniority. Kreszowski offers only speculation that these two events are connected. Such speculation is insufficient to show his protected activity was "a but-for cause of [FCA's] alleged adverse action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

## V. CONCLUSION

I conclude a reasonable jury could not find in Kreszowski's favor on either his discrimination or his retaliation claims. Therefore, and for the reasons stated above, I deny FCA's motion to strike, grant its motion for leave to file a response to the sur-reply brief, (Doc. No. 31), and grant its motion for summary judgment. (Doc. No. 16).

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge